## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **IDONA WALLACE** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KMART CORPORATION** | : | **NO. 02-0107** |

_____

| | | |
|---|---|---|
| **ERROL STANLEY,** *et al* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **ST. CROIX BASIC SERVICES, INC.,** *et al* | : | **NO. 03-055** |

_____

| | | |
|---|---|---|
| **FORREST THOMAS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **CENTENNIAL COMMUNICATIONS,** *et al* | : | **NO. 03-163** |

_____

| | | |
|---|---|---|
| **MARK VITALIS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SUN CONSTRUCTORS, INC.,** *et al* | : | **NO. 05-101** |

_____

| | | |
|---|---|---|
| **PATRICE CANTON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KMART CORPORATION** | : | **NO. 05-143** |

GLENFORD RAGGUETTE           :      CIVIL ACTION
                                     :
      v.                           :
                                     :
PREMIER WINES AND SPIRITS, LTD.  :      NO. 06-173

_____

TERRANCE ALEXIS                   :      CIVIL ACTION
                                     :
      v.                           :
                                     :
HOVENSA LLC and HESS CORPORATION  :
f/k/a AMERADA HESS CORPORATION     :      NO. 07-091

## MEMORANDUM OPINION

**Savage, J.**                                                    **September 1, 2011**

In the names of her clients, Lee J. Rohn has moved to recuse the presiding judge in these seven unrelated cases in which she represents the plaintiffs. Moving under 28 U.S.C. §§ 455(a)[1] and (b)(1), she contends the judge cannot treat her, her law firm and her clients fairly and impartially. She relies upon declarations, the records of two trials that resulted in verdicts against her clients and the testimony at a hearing on the recusal motions. She argues that this evidence demonstrates or, at least, has the appearance of a bias and hostility.

There are two categories of her clients: (1) those who lost their cases and against whom are pending motions for fees and costs; and (2) those whose cases have not been tried. Movants in the first group, Mark Vitalis and Idona Wallace, base their motions on what happened in their respective trials. The other movants rely on what Vitalis, Wallace,

---

[1] The motion also relies upon Rule 2.11 of the American Bar Associations Model Code of Judicial Conduct. The model rules are inapplicable.

Rohn and her staff told them had occurred in the *Vitalis* and *Wallace* trials.  The latter group filed their motions solely on the basis of what others had told them and not on any first-hand knowledge.

Rohn's decision[2] to move to recuse from all cases in which she is counsel was made before the second group of movants knew anything about the judge.  All movants were enlisted by Rohn's office in a coordinated effort to launch a joint attack.  The weapons were declarations that were constructed by the attorneys and placed in the hands of the movants.  The attorneys produced the sources of the misinformation in the declarations, passing it as accurate to those who had no knowledge of or familiarity with the events.

Unhappy with the verdicts in their cases, Wallace and Vitalis complained to the other movants who had been assembled by Rohn's office staff at her office or put in touch over the telephone.   The movants signed declarations that are strikingly similar and unmistakably created by a single person.  Rohn's associate, Ryan Green, admitted to preparing the declarations in the law office along with Lauren Allu, another Rohn associate.[3]  Although he attributes the contents to the declarants, the statements in most declarations clearly were not based on the declarants' personal knowledge.  Instead, they were the creation of the attorneys.

---

[2] There is no doubt that it was Rohn's, not her clients', decision.  Her communications to Chief Judge Gomez show that she wanted her cases reassigned.  She complained of personal problems and did not mention any complaints from her clients.

Ten days after *Bergan v. Kmart*, C.A. No. 07-120, was reassigned to me, Rohn filed a Motion to Reconsider Assignment of Case to Judge Timothy Savage (Doc. No. 90).  In it, she wrote ". . . there is an ongoing conflict between Judge Savage and Plaintiff's counsel such that Plaintiff's counsel has requested Judge Savage to recuse himself from cases in which Attorney Rohn is counsel as a result of lack of impartiality and bias."  She later filed a recusal motion mimicking the motions previously filed in the other cases.

[3] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 243, 290-291.

The second group did not have the facts providing the context of the complaints Vitalis and Wallace made to them.  To overcome the absence of any personal knowledge (even though they had already signed declarations), they testified that they personally observed intemperate and inappropriate judicial conduct during the recusal hearing.[4]  The record, both print and audio, contradicts the allegations made by these movants.  Additionally, disinterested witnesses who observed the recusal hearing testified that it was Rohn, not I, who misbehaved, provoking the judicial responses about which she now complains.

The effort here goes beyond seeking recusal.  It is an attempt to impugn the character and the reputation of a judicial officer.  It makes serious charges of judicial misconduct.

The extreme allegations are false.  They are not merely misleading.  They are contrived.

There is no objective evidence of settled animosity or bias against Rohn or her clients.  There is evidence that I insisted that my rulings be respected and that Rohn behave professionally and ethically.  Therefore, because there is nothing from which an objective observer could conclude that I appeared biased against or unfair to Rohn and/or her clients, the motions to recuse will be denied.

### Legal Standard

A judge's opinion that rises to the level of bias may require recusal whether it was formed during or outside judicial proceedings.  *Liteky v. United States*, 510 U.S. 540, 554

---

[4] *See* Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 209 - 211,  258 - 260,  272, 273, 301 - 303.

(1994).  A predisposition developed during proceedings can suffice, but only in the rarest case.  *Id.*  On the other hand, where the source is outside the courtroom, an extrajudicial source, does not necessarily demand recusal.  *Id.*  Thus, "neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias."  *Id.*

Rulings alone rarely justify recusal.  *Id.* at 555.  Rulings can show such a degree of favoritism or antagonism requiring recusal "only in the rarest circumstances" when there is no extrajudicial source.  *Id.*  Opinions formed on the basis of what has happened in the courtroom are not enough to warrant recusal unless they display "deep seated" bias.  *Id.*  "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."  *Id.*

The Supreme Court has made it clear that "expressions of impatience, dissatisfaction, annoyance, and even anger" do not establish bias or partiality.  *Id.* at 555 - 556.  In short, "[a] judge's ordinary efforts at courtroom administration – even a stern and short-tempered judge's ordinary efforts at courtroom administration – remain immune."  *Id.* at 556.

In applying § 455(a), we apply an objective standard in determining whether disqualification is warranted.  The question is whether a judge's impartiality might be questioned from the perspective of a "reasonable observer who is informed of all the surrounding facts and circumstances."  *Cheney v. United States District Court for the District of Columbia*, 541 U.S. 913, 924 (2004); *Blanche Rd. Corp. v. Bensalem Twp.*, 57 F.3d 253, 266 (3d Cir. 1995) *abrogated on other grounds by United Artists Theatre Circuit,*

*Inc. v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003).  The disqualification test requires that the "reasonable person" must be aware of all relevant facts.  *Sao Paulo State of Federative Republic of Brazil v. Am. Tobacco Co., Inc.*, 535 U.S. 229, 232-33 (2002). In other words, unless the witness supporting a recusal motion knows the context of the cited judicial action, there is no basis for forming an objective opinion.

### Discussion

Because the grounds for recusal recited in all the declarations rest upon what happened in the *Wallace* and *Vitalis* trials, there is no basis for recusal if there was no bias or partiality in those judicial proceedings.  Thus, we shall start with the claims of Wallace and Vitalis.

### The *Wallace* Trial

During the *Wallace* trial, neither Rohn nor her client voiced any complaints about the manner in which the trial was conducted.  Only after a defense verdict was rendered and evidence at a post-verdict hearing revealed that Rohn's office, through its investigator, had improper contacts with jurors,[5] did Rohn and Wallace raise issues about the trial.

Rohn and Wallace now complain that I mistreated Dr. Gary Jett, Wallace's treating physician, and improperly asked him questions.[6]  Jett's testimony was confusing and suspect.  He had written separate expert reports, one for each of Wallace's two unrelated

---

[5] Hearing on Motion for New Trial Tr., Jan. 12, 2010, at 135-138.  When a hearing was scheduled, Rohn withdrew her client's motion for a new trial.  Because there were concerns of improper juror contacts in contravention of local rules, the parties were ordered to proceed with the hearing notwithstanding the withdrawal of the motion.  Rohn responded by refiling the post-verdict motion.

[6]  Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 389-391.

personal injury cases in which Rohn represented her.[7]  The reports were almost identical. They recited the same injuries, diagnosis, treatment and prognosis.  In each report, Jett attributed the cause of the injuries to the incident in the case in which the report was produced and did not mention the other incident.  Given this glaring omission, it was necessary to clarify the expert testimony which had the tendency to mislead the jury into believing that the injuries were caused solely by the incident in the case on trial.

A judge has the authority to intervene in the fact-finding process by questioning witnesses when the ends of justice may be served.  *United States v. Time*, 21 F.3d 635, 639 (5th Cir. 1994); *United States v. Experts*, 722 F.2d 1090, 1093 (3d Cir. 1983). Because a judge has the responsibility to ensure that issues are clearly presented to the jury, the judge may question witnesses to clarify facts that did not appear from counsel's examination.   *See, e.g., Hanson v. Waller,* 888 F.2d 806, 813 (11th Cir. 1989). Additionally, a judge may intercede to elicit information from witnesses who are less than candid.  *See, e.g., United States v. Cassiagnol*, 420 F.2d 868, 879 (4th Cir. 1970).  He may also question an expert to clarify his theories.  *Id.*

Wallace's other complaints lack specificity.[8]   She was unable to identify a credible

---

[7]  Because Rohn represented Wallace in both cases and she produced the separate reports in each, she had to have known they were misleading.  It appears that they were being used independently of each other to maximize the damages claims in each case.  In other words, there was an effort to conceal that there may have been contributing factors to Wallace's injuries in each case.

[8]  *See, e.g.,* Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 280 ("Mean to me; mean to my counsel."); *id.* at 287 ("During the trial, he was very mean, and he was rude."); *Wallace Aff.*, ¶ 3 (the judge "spoke to my counsel in an angry tone . . . cut off witnesses in mid-sentence, and he adopted an extremely rude tone of voice and demeanor toward my witnesses and their testimony"); ¶ 4 (the judge "used his body language, tone of voice, and facial expressions during the course of the trial to express what amounted to contempt for my counsel [and] the merits of my case").  She testified that the judge was rude and treated her as if she were lying.  Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 267.  She also stated he "yelled" and looked at her attorney with "disdain."  *Id.* at 268.  She cites to nothing in the trial transcript.

specific incident.  Indeed, nothing in the trial record substantiates her allegations.

The *Vitalis* Trial

Vitalis complains that he should have won his case, and the fact that he did not demonstrates judicial bias against him.[9]  He cites the preclusion of four of his proffered witnesses.[10]  His perspective is based upon a misunderstanding that his case was about the defendants' failure to hire "locals" from St. Croix.[11]  The action was brought under 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981 for discrimination based upon race and national origin.  It was not about discrimination against locals from St. Croix or violations of Virgin Islands law governing hiring practices.[12]

He claims that I was not fair to him or his attorney.  He testified that I shouted at his attorney, paced the floor, sneered at him, treated his witnesses as liars, and was rude to his witnesses while treating defense witnesses politely and defense counsel as my "brother."[13]  These statements are untrue.  Nothing in the record supports his claims.

Martial Webster, a criminal defense attorney and Rohn's co-counsel at trial,[14] based his observations on the same misperception about the theory of the case.[15]  Because he was not present at the pre-trial hearing, he was not aware and did not appear to care about

---

[9]  Recusal Hearing Tr. vol. 1, Jan. 25, 2011, 81-82, 84.

[10]  *Id.* at 48, 81.

[11]  *Id.* at 66.

[12]  Pretrial Tr., Feb 22, 2010, at 53-54.

[13]  *Id.* at 33, 44.

[14]  Webster refers cases to Rohn and she to him.  He is paid referral fees by Rohn.  Hearing Tr. vol. 1, Jan. 25, 2011, at 223.

[15]  *Id.* at 240-242.

the pre-trial rulings.  Had he known that I had ruled that the case was not about discrimination against "locals," but rather discrimination against Vitalis based on his race and national origin, Webster would not have insisted in his testimony that the trial rulings and admonitions were biased.

During the recusal hearing, Rohn called Mary Walsh as a witness.  Walsh, a personal friend and former roommate of Rohn's, was visiting and staying with her in St. Croix during the *Vitalis* trial.  Walsh attended the trial for one hour and fifteen minutes and only observed the questioning of one witness, Dr. Copeman.  She testified that I was "disdainful and disrespectful" to Rohn and favored the defense.[16]  Walsh testified that I "slumped and turned away when Attorney Rohn was questioning Dr. Copeman, but was fully engaged in good posture . . . when the defense was doing its questioning." [17]

Walsh was not an objective observer.  While she was staying at Rohn's house during the Vitalis trial, Rohn had already told her that the judge would not be fair.[18]  Thus, prior to coming to the Vitalis trial and observing the judge's behavior, Walsh had an understanding, albeit a biased one, that colored her perception of what was happening.

Walsh's testimony about my body language was equivocal.  For instance, she testified that I favored the defense by "turning away" when Rohn was questioning Dr. Copeman.[19]  She could not articulate how "turning away" was biased and admitted that

---

[16] Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 114, 141.

[17] *Id*. at 141.

[18] *Id*. at 129.

[19] *Id*. at 115.

"you can take a lot of different meaning out of that."[20]  She testified that I showed bias towards Rohn by "slumping" when Rohn was questioning Dr. Copeman.  However, she conceded that she could not see what I was doing while I was "slumping" and that I could have been taking notes.[21]

Rohn contends that during the *Vitalis* trial at a side bar, I gave advice to defense counsel and that I covered the microphone to avoid transcription.  She claims I "instructed" defense counsel to stop objecting because he was hurting his case.  As the record reflects, I admonished defense counsel for making needless objections that were unnecessarily interrupting the flow of the trial.[22]

In the motions and again in her testimony, Rohn recites a litany of instances where she claims she was inappropriately admonished or restricted from introducing evidence, demonstrating a bias against her.[23]  As the record of the trial shows, they were judicial responses to her repeated attempts to get inadmissible and prejudicial evidence, directly and indirectly, before the jury.[24]

A judge has the obligation to insure that the issues are presented to the jury without any unwarranted appeals to the jurors' emotions.  *See United States v. Pisani*, 773 F.2d 397, 403 (2d Cir. 1985); *United States v. Rivera*, 778 F.2d 591, 593 (10th Cir. 1985) ("The

---

[20] *Id.*

[21] *Id.* at 124.

[22] Trial Tr. vol. 3, Feb 24, 2010, at 24-25.

[23] *See, e.g.,* Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 389-390, 403, 405, 409-411.

[24]  The juries in the Vitalis and Wallace trials were instructed that my rulings were not to be taken as any indication that I favored either party or what the verdict should be.  Trial Tr. vol. 4, Feb. 25, 2010, at 82-83; Trial Tr. vol. 3, Oct. 28, 2009, at 53-54.

trial judge has an obligation to keep the trial on track and to prevent unfair appeals to sympathy or prejudice."); *Berger v. Zeghibe,* No. 08-5861, 2010 WL 3768379, at *5 (E.D.Pa. Sept. 24, 2010) ("In conducting a trial, it is the court's duty to see that the issues are not obscured and that the testimony is not misunderstood.") (internal quotations and citations omitted).

Vitalis cited the treatment of Cecil Benjamin as an example of judicial bias.  He testified that Benjamin was treated as an uneducated person and was improperly precluded as his witness.  Remarkably, Benjamin did not believe he was mistreated.  At the recusal hearing, he described the judge as "pleasant at the end."[25]

Benjamin's testimony at the trial was proffered to show that the defendants had failed to comply with Virgin Islands jobs posting requirements.[26]  Violation of Virgin Islands law was not at issue.  Federal law was.

Benjamin did not conclude that there was any bias against Vitalis or Rohn.  He complained that I interrupted and questioned him, leading him to believe it was "not a friendly court [sic]."[27]  Claiming that he was treated as other witnesses were,[28] he complained that witnesses were not permitted to express their personal views.[29]

---

[25] Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 156.

[26] Pretrial Tr., Feb 22, 2010, at 49-55; Trial Tr. vol. 2, Feb 23, 2010, at 33-35.

[27] *Id*. at 151-152.

[28] *Id*. at 160.  Benjamin did not explain how he knew the way other witnesses were treated.  All witnesses, including Benjamin, were sequestered.  His source could only have been extrajudicial.  His information had to have come from others.

[29] *Id*. at 153.

Benjamin testified outside the presence of the jury.[30]  Anything that occurred during his testimony could not have had any impact on the jury and could not have affected the verdict.

Similarly, Chester Copeman, whom Rohn has paid over $1,000,000 in expert fees, testified that he detected a "sense of anger" and hostility toward Rohn.[31]  He discerned a different attitude toward the witnesses.[32]  He acknowledged that I was controlling but, nonetheless, cordial and polite to the witnesses, including himself.[33]  At the same time, he conceded Rohn's behavior was "challenging" and that she did "not behave docilely." [34]

Abdul Ali, who was a plaintiff's witness at the *Vitalis* trial and has no known connection with Rohn or Vitalis, testified at the recusal proceeding.  His testimony did not support the movants.  On the contrary, what he described does not reflect any bias.  Rather, he felt I was attempting to maintain control the way judges might do and that how I did it "might be [my] manner."[35]  He did not testify, explicitly or implicitly, that he discerned any bias or partiality.

Rebukes and warnings to counsel were provoked by counsel's unprofessional and disrespectful conduct.[36]  The record is replete with instances of Rohn's misconduct.

---

[30] *Id.* at 156.

[31] *Id.* at 174.

[32] *Id.* at 176, 185.

[33] *Id.* at 176, 185.

[34]  *Id.* at 178, 196.

[35] Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 164-165.

[36] *See, e.g.,* Trial Tr. vol. 2, Feb 23, 2010, at 66 (Rohn throws her glasses because she is tried of the judge "constantly yelling at [her]"); *id.* at 208, 211 (Rohn warned not to mischaracterize testimony); *id.* at 212-

Rohn challenged the court when, despite a ruling that the plaintiff could not introduce certain evidence, she defiantly insisted she would do so anyway.[37]  Joe Wiley, Sun Constructors Vice President and General Counsel who was present during the final pretrial conference in *Vitalis*, confirmed that Rohn insisted that her witnesses would testify even after I ruled that they could not.[38]  Indeed, he testified that when Rohn insisted that her witnesses would testify, she did so with "a very flippant, arrogant attitude that was terribly insulting to the court." [39]

Rohn repeatedly injected a legally impermissible and prejudicial theory in her questioning of witnesses and arguments to the jury, provoking admonishment and requiring clarification, including jury instructions to remediate prejudice to the defendants.[40]  Rohn simply cannot now complain about a judge's fulfilling his obligation and duty to enforce his orders and to ensure a fair trial when necessitated by her own conduct and behavior.

Rohn displayed disrespect for the tribunal by talking over the judge,[41] using a sarcastic tone of voice and whispering comments after receiving unfavorable rulings.[42]  In

---

213 (Rohn repeatedly ignoring ruling on improper line of questioning); *id*. at 246 (Rohn warned to stop leading her witness); Trial Tr. vol. 3, Feb 24, 2010, at 216 (Rohn ignoring ruling on objection); *id*. at 216 (Rohn warned about misleading jury).

[37] Pretrial Tr., Feb 22, 2010, at 115; *see also* Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 247 (Martial Webster confirms that Rohn insisted on introducing precluded evidence).

[38] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 334.

[39] *Id*. at 341-42

[40] Trial Tr. vol. 2, Feb. 23, 2010, at 39-40, 42, 47, 104, 326-27 (repeatedly warning Rohn to stop introducing evidence concerning "locals" issue and instructing the jury to disregard such statements); Trial Tr. vol. 3, Feb. 24, 2010, at 17-18, 20, 201, 221, 225-227.

[41] Trial Tr. vol. 4, Feb. 25, 2010, at 12 (warned to stop interrupting judge).

[42] Pretrial Tr., Feb. 22, 2010, at 115.

one display of anger, she threw her glasses onto counsel table.[43]   At the recusal hearing, she testified that she "tossed" her glasses from her hands to her papers.[44]  At the trial, she had admitted that she "threw" them.[45]  Martial Webster testified that Rohn "got frustrated . . . and threw her glasses."[46]  Joe Wiley confirmed that Rohn "threw her glasses at least a couple of feet."  In any event, she made a demonstrative display of her displeasure with the ruling.

What is remarkable is that Rohn does not dispute that she did what precipitated the judicial responses.  She does not deny that she sought to have the jury focus on the "locals" issue.  Instead, she unapologetically argues that she could do so.  The court's ruling - right or wrong - was binding.  She knowingly and intentionally ignored it.

Throughout the trial, despite the unequivocal ruling and numerous warnings, Rohn repeatedly injected references to discrimination against "locals."[47]  Given her multitudinous efforts to have the jury consider the impermissibly prejudicial "locals" issue and her threat to do so despite the ruling that she could not, one can only conclude that it was not inadvertent, but intentional.

Vitalis did not dispute that his attorney acted inappropriately.  Instead, he offered an excuse for her misbehavior.  He recognized that his attorney was unhappy with the

---

[43] Trial Tr. vol. 2, Feb. 23, 2010, at 66.

[44] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 128.

[45] Trial Tr. vol. 2, Feb. 23, 2010, at 66; *see also* Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 244.

[46] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 333.

[47] Trial Tr. vol. 2, Feb. 23, 2010, at 39-40, 47, 104, 326-27; Trial Tr. vol. 3, Feb. 24, 2010, at 17-18, 20, 201, 221, 225-227.

14

court's rulings.  He recounted how she would "question" me about the unfavorable rulings.[48]
He described her as "pushed to the limit" and frustrated.[49]  In the end, he cannot deny that
his attorney acted unprofessionally.

Rohn came to the *Vitalis* trial with an attitude.  She was unhappy with rulings on
motions *in limine* that she believed limited her presentation of evidence.  She challenged
those rulings by threatening to disregard them.[50]  As a result, any judge would be on alert.

A judge does not take pleasure in admonishing counsel.  Rather, a judge prefers
to preside over a trial that reflects respect for the rule of law.  It was with reluctance that
I had to remain vigilant throughout the *Vitalis* trial after Rohn made it clear that she
intended to focus on the "locals issue" regardless of my rulings.  Despite the unequivocal
ruling that discrimination against Virgin Islands "locals" and Act 5174 were not the issues,[51]
Rohn insisted on attempting to inject those issues before the jury.

Everything about which Vitalis and Wallace complain occurred during their trials.
The rulings and the treatment of their counsel and their witnesses were related to what had
happened in the course of the proceedings.  There was nothing that occurred in those trials
that would lead an objective observer to conclude that the proceedings were anything but
fair and impartial.   A reasonable person, having the benefit of all the facts and
circumstances, could not question whether I was not impartial.

---

[48] Recusal Hearing Tr. vol. 1, Jan. 25, 2011, at 50.

[49] *Id.* at 93.

[50] Pretrial Tr., Feb. 22, 2010, at 115.

[51] Pursuant to 27 V.I.C. 303b ("Act 5714"), employers in the Virgin Islands are required to post all job vacancies with the Virgin Islands Department of Labor.  The purpose of the requirement is to assure that locals may compete for jobs.

Bergan's Motion

Unlike in the other movants' cases, there were no rulings for or against Cora Bergan preceding the filing of her recusal motion.   She had nothing about which she could complain.

Bergan's source of information was Vitalis, Wallace, Rohn's associates and Rohn herself.[52]  Like the other movants, Bergan was summoned to her attorney's office and told that her case was assigned to a judge who could not be fair and impartial.[53]  She was directed to speak to two individuals, Wallace and Vitalis, who had similar cases to hers and who "did not receive a fair trial."[54]

When Bergan contacted Wallace, Wallace told her she had been expecting her call.[55]  Wallace told Bergan that she had lost her case because "Judge Savage was rude and disruptive" and her witnesses were "not given equal opportunity to speak."[56]  Both Wallace and Vitalis told Bergan that "Judge Savage" was "biased towards them."[57]  Based on those conversations, Bergan concluded that the assigned judge with whom she had had no contact could not be fair to her.[58]

Bergan's testimony demonstrates how she was deliberately misled.  She was so

---

[52] Bergan Hearing Tr., Nov. 4 2010, at 8, 14, 23.

[53] *Id*. at 5.

[54] *Id*. at 8.

[55] *Id*. at 13.

[56] *Id*. at 13.

[57] *Id*. at 14-15.

[58] *Id*. at 14.

influenced by these tainted sources that she had irrevocably decided she could not receive a fair trial.  She testified that even if Vitalis and Wallace were incorrect in their reporting of what had happened, she still did not want her case tried before me because she "already had a bad taste in [her] mouth" based on what they had told her.[59]  She was adamant and had clearly decided she wanted to pursue recusal at that hearing.  Yet, at the recusal proceeding several months later, she professed to have come with an "open mind," reciting the same mantra as the other movants who had no first-hand knowledge.[60]  Her response suggests it was rehearsed with the others.  Her testimony was either untruthful or the product of misinformation supplied by others having their own agenda.  Whether it was manufactured or based on bad information, it was wrong.  Bergan has no objective basis for seeking recusal.

Creation of the Declarations

How Rohn's clients have been manipulated and their testimony orchestrated is apparent from how the declarations were constructed and the testimony was scripted.  The declarations are nearly identical.  They use the same language, recite the same conclusory statements and cite no specific conduct.  *See, e.g., Wallace Aff.,* ¶ 3 ("During trial I was shocked by Judge Savage's rude and contemptuous demeanor toward me, my witnesses and my counsel in the presence of the jury."); *Vitalis Aff.,* ¶ 4 (same); *Alexis Aff.,* ¶ 4 ("I have learned about Judge Savage's rude and contemptuous demeanor toward the Plaintiff's witnesses and . . . Attorney Rohn . . . in the trial of Ms. Idona Wallace and Mr.

---

[59] *Id.* at 18.

[60] Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 305, 314.

Mark Vitalis[ ]."); *Canton Aff.*, ¶ 4 (same); *Ragguette Aff.,* ¶ 4 (same); *Thomas Aff.,* ¶ 4 (same).  When asked at the hearing to point out exactly what happened about which they complained, they were unable to do so.[61]  Instead, they described their own feelings about sensing a rift between me and their attorney, and repeated the conclusory statements in their declarations. [62]

How Rohn and her associates manipulated her clients in the preparation of the declarations is apparent from Herlene James-Steele's testimony in the hearing to have Rohn removed as her counsel.[63]  James-Steele vehemently insisted that she had never wanted me recused and had not consented to the filing of a recusal motion.[64]  In October, 2010, she was informed she had to appear at Rohn's office and testify at a recusal hearing two days later.[65]  Despite James-Steele's being in pain as a result of an ankle injury, Rohn "still insisted" on her appearing at her office.[66]

Rohn had told James-Steele that "she was having a problem with Judge Savage."[67]  At that point, James-Steele had had no contact with me.  It is obvious that Rohn planted the seed of discontent, hoping to get James-Steele on board.  It is the same manipulation

---

[61] Recusal Hearing Tr. vol. 1 Jan. 25, 2011, at 44, 45-46, 47-48, 57, 67-68, 82, 84, 92-93, 282-283; Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 229-230, 232-233.

[62] *See, e.g., Recusal* Hearing Tr. vol. 1 Jan. 25, 2011, at 286, 290-292, 306, 307-308; Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 209, 260, 273.

[63] The hearing was on James-Steele's motion to have Rohn removed as her counsel.  After James-Steele and her attorney-nephew had demanded that she withdraw her appearance, Rohn refused.

[64] James-Steele Hearing, Jan. 25, 2011, at 21-23.

[65] *Id*. at 22.

[66] *Id*. at 29-30.

[67] *Id*. at 21.

that Rohn's associates used in enlisting the clients who knew nothing about the judge to whom their cases had been assigned.

An example of the fashioned testimony appears in the testimony of Thomas and Bergan who claimed to have come to the hearing with an "open mind."[68]  Both used the same phrase even though they had signed declarations and joined in seeking recusal earlier before ever having any contact with the court.   Other movants testified about instances that they could not have known.

The incredulity of Thomas was obvious when he testified that everyone in the community is talking about the judge's conduct.[69]  When questioned, he could not name anyone to whom he had spoken.[70]  Unable to do so, he then claimed to have overheard passersby, whom he did not know, discussing it.[71]

Objective Observers

Rohn argues that the sheer number of witnesses who testified in the recusal matter establishes the credibility of her complaints.  It is not the quantity of the evidence, but its quality, that is determinative.  The quality of the movants' evidence must be viewed in light of the source.

The recusal standard is an objective one - whether an "objective observer" would have a reasonable question regarding the judge's impartiality.   None of the movants' witnesses was objective.  Wallace and Vitalis had lost their cases and are facing motions

---

[68] Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 286, 305, 314.

[69] Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 278.

[70] *Id.* at 279.

[71] *Id.*

for costs.  Canton and Ragguette had summary judgments entered against them.  Thomas, Bergan and Alexis have cases in the pre-trial stage and their summary of information regarding me came from tainted sources.  Walsh is Rohn's former college roommate and close friend who often visits and stays at her home.  She saw a snippet of the proceedings, depriving her of any context in which to assess what was actually happening and why Rohn was being admonished.

On the other hand, witnesses, who had no stake in the outcome or were not subject to influence by those who did, were in a position to make an objective assessment. James-Steele's three attorneys, officers of the court, who had dealings with Rohn before and after the recusal motions were filed, have nothing to gain from giving anything other than an objective view and testifying truthfully.  Similarly, two legal interns observing different proceedings, Luc El-Art T. Severe and Allen Woodward, have no connection to any of the parties, the attorneys or me.

Disinterested witnesses having no connection to the lawyers or the litigants contradict Rohn's description of my behavior.  Severe, a law student intern with the Virgin Islands District Court who was sitting in the courtroom during the first *Bergan* recusal hearing,[72] submitted a declaration.  He stated that during the hearing, Rohn "yelled at Judge Savage when the Court made inquiries of witnesses" and that Rohn "aggressively argued" with the judge.[73]  He affirmed that during the hearing, Rohn falsely accused me of "throwing" my microphone and on "several" occasions "misrepresented a statement made

---

[72]  On November 4, 2010, a hearing was held on Bergan's motion to recuse Judge Savage. During the hearing, Rohn stated on the record that Judge Savage "raised [his] voice" to her and "threw" his microphone.  Bergan Hearing Tr., Nov. 4 2010, at 7, 10-11.

[73] *Severe Aff.,* ¶¶ 4,5.

by [me]."[74]  Severe clarified that I "did not shout as Plaintiff's attorney characterized."[75]  In other words, his testimony disputed what Rohn stated during the hearing in an attempt to fabricate a misleading record.

Woodward, another intern, observed the January recusal hearing.  Without warning, he was called as a witness.  He contradicted Rohn's allegations about what happened and remarks made during the hearing.  He testified that I was "fair and impartial" during the hearing, and did not "scream" or make inappropriate facial expressions as Rohn repeatedly represented on the record throughout the hearing.[76]   Other witnesses, although not completely disinterested but credible, confirm Rohn's misbehavior that produced strong judicial responses.  Joe Wiley, a former prosecutor, was present for the *Vitalis* pretrial hearing and the trial.   He testified that "like most judges . . . Judge Savage insists that his court be conducted with professionalism and decorum."[77]  According to Wiley, the judge is "very cordial and accommodating until someone breaks a rule."[78]  "When they break the rule, he's very firm in . . . telling the attorney they broke the rule."[79]  If they do it more than once, "like most judges [he] gets a little more forceful in [his] admonitions."[80]

Wiley testified that during the *Vitalis* trial, Rohn made statements that she knew had

---

[74] *Id*. at ¶ 6.

[75]  *Id*. at 6.

[76] Motion Hearing Tr., January 27, 2011, at 11-12.

[77] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 336.

[78]  *Id*.

[79]  *Id*.

[80]   *Id*. at 336-337.

been ruled impermissible, and she was admonished "many times" for disregarding those rulings.[81] He testified that during the proceedings, Rohn "took exception" to my rulings and "expressed a great deal of frustration and aggravation to an extent I had not really seen in a court."[82] Wiley had "never seen an attorney conduct themselves in such a way to be so arrogant in light of [a] judge's position" or "conduct [their] business with such disregard for the rulings of the court."[83]

The <em>James-Steele</em> Misrepresentations

To support the recusal motions, Rohn contends that I expressed a dislike and animosity toward her to others. She claimed I had made disparaging remarks about her to three attorneys who were working with her on the *James-Steele v. Ford Motor Company* case. She testified that I had demanded of them that she and her firm withdraw their appearances or the case would not proceed.

James-Steele's involvement in the recusal matter reveals Rohn's duplicity and recklessness. When Rohn filed the recusal motions on behalf of her other clients, she specifically excluded James-Steele's case. When defense counsel in that case raised the issue that Rohn's accusations in the other cases cast a cloud over any case assigned to me in which she was counsel, Rohn withdrew her appearance. However, because her firm was still appearing in the case and she had claimed animosity towards her firm as well as her, the defendant still did not want to proceed while the recusal motions in the other cases

---

[81] *Id*. at 334-337.

[82] *Id*. at 331.

[83] *Id*. at 332.

were outstanding.  The defendant feared that if it obtained a favorable verdict, Rohn or her firm would raise the same contentions asserted in the pending recusal motions as a ground for appeal.

Rohn then re-entered her appearance and sought recusal on behalf of James-Steele, who had no idea that Rohn had done so and had not authorized her to do.[84]  In support of the *James-Steele* motion for recusal, Rohn made numerous representations in a declaration and later testified at the recusal proceeding about conversations that she alleged she had had with her co-counsel, Greg Allen, Christopher Glover and Richard Golumb, whom she had brought into the case.  She attributed statements to them in which they allegedly reported I had made disparaging remarks about her and refused to proceed with the case as long as she and her firm were involved.[85]   These three lawyers unequivocally and emphatically testified that they had not told her anything that she swore they had.[86]    Rohn's testimony was false.  None of the statements she swore had been made were ever uttered.

When these attorneys refused Rohn's demand that they change their testimony after their depositions, Rohn threatened to sue them.[87]  When they refused to perjure themselves, she delivered on her threat, suing them.[88]

---

[84] *James-Steele* Hearing, Jan. 25, 2011, at 21-21.

[85] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 18 - 21; *see also Rohn Dep.,* at 123 - 126 (August 12, 2010).

[86] Hearing Tr. vol. 2, Jan. 26, 2011, at 46, 62-67, 119, 125, 187-192, 194.

[87] Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 50; Recusal Hearing Tr. vol. 2, Jan. 26, 2011, at 68, 140, 183-184.

[88] *Rohn and Carpenter, LLC v. K. Glenda Cameron, et al.,* No. 2011-CV-45 (D.V.I. 2011).

It is telling that the witnesses over whom Rohn had no control or influence did not corroborate her testimony. In fact, they contradicted it under oath. Thus, because the alleged extrajudicial statements exhibiting hostility and animosity toward her were not made, Rohn's fabricated testimony cannot support recusal.

Rohn's Third Circuit Misrepresentation

Rohn makes much of the discussion about correcting her misstatements to the Third Circuit. She contends that during the *Vitalis* trial she was distracted by demands that she notify the appellate court that she was withdrawing an argument in another case.

In the appeal in the *McNamara* case,[89] Rohn argued that the district court had committed error when it failed to conduct a *Daubert* hearing before granting motions partially precluding the plaintiff's witnesses from testifying to certain matters. Because she had specifically waived *Daubert* hearings during a pretrial conference,[90] her appellate argument was based on a misrepresentation to the Third Circuit.[91]

During the *Vitalis* trial, Rohn approached and tried to explain away her *Daubert* argument as a lack of recollection. She did not dispute what both her opposing counsel in the *McNamara* case and I knew - she had waived the hearing. She was informed that she had an ethical and professional obligation to correct the record. She responded that she would do so immediately. The brief conversation she refers to was to confirm that she

---

[89] *McNamara v. Kmart Corp.,* 08-cv-00018 (D.V.I.); *McNamara v. Kmart Corp.,* No. 09-2216, 380 Fed. App'x 148 (3d Cir. 2010)

[90] During the recusal hearing, Wilfredo Geigel, defense counsel in *McNamara*, confirmed that Rohn had waived her right to a *Daubert* hearing during a conference with the judge. Recusal Hearing Tr. vol. 3, Jan. 27, 2011, at 325-26. In fact, she had represented that she did not want a hearing in response to the court's question.

[91] To assure that the appellate court was presented with what had actually happened, a memorandum opinion was issued. *See McNamara v. Kmart Corp.,* No. 08-18, 2010 WL 56070 (D.V.I. Jan. 5, 2010).

had done what she had said she was going to do - correct her misstatement to the Third Circuit.[92]  Contrary to her sworn statement in the recusal matter, she was never threatened with the imposition of sanctions in the *Vitalis* case for her misrepresentation to the Third Circuit in the *McNamara* case.[93]

Letters to Chief Judge Gomez

Rohn's letters to Chief Judge Gomez expose her disregard of the facts.  She misleadingly represented that she was ordered to attend a settlement conference in Philadelphia in the *Rivera v. Kmart* case, creating the impression that she was forced to make arrangements and prepare on short notice.  The *Rivera* case was one of six cases of Rohn's against Kmart that were scheduled as part of a two-day settlement program to accommodate all parties.  Kmart's representatives from Chicago with full authority agreed to participate as long as they could do it mid-way in Philadelphia.  Rohn was invited to participate.   If she had declined, the settlement conferences would not have been scheduled.  Hoping to resolve her cases, she agreed.  The program was successful - four of the six cases settled.

She also complained that after she brought to our attention that Chief Judge Bartle and I had scheduled trials for the same date, I rescheduled the trial before me without consulting her.  Apparently, as referenced in her letter, she previously complained to Chief Judge Gomez about visiting judges refusing to "hold settlement conferences, the unilateral setting of trial and hearing dates, the disregard for the schedules of other judges and the

---

[92] Trial Tr. vol. 2, Feb. 23, 2010, at 238.

[93] *Id.*

lack of accommodation."

She fails to mention that the judges worked to accommodate her schedule. Whenever a scheduling conflict was brought to my attention, I consulted with the judge in the other case, whether in the District Court or the Virgin Islands Superior Court, to coordinate the schedules.

The timing of her letters reveal her motivation. Her first letter, dated December 22, 2009, was two months after the *Wallace* trial. She mentioned nothing about any judicial bias or partiality in that trial. Her second letter came within weeks of the *Vitalis* trial. In it she complained of "bias and lack of impartiality," and charged that I "violated the Canons of Judicial Conduct." She requested the reassignment of her cases. When Chief Judge Gomez did not reassign the cases, Rohn filed the recusal motion.

### The Solution

An attorney, who is unhappy or discontented having her cases managed and tried by a judge who insists on candor, proper comportment and adherence to the rules must not be permitted to create an apparent conflict with the judge to support a recusal motion. *See FDIC v. Sweeney,* 136 F.3d 216, 219 (1st Circuit 1998) ("A party cannot force disqualification by attacking the judge and then claiming that these attacks must have caused the judge to be biased against her.") (internal quotations and citations omitted). In other words, an attorney cannot, by her own disruptive and inappropriate conduct, instigate a forceful judicial response and cite that response as a basis for recusal. If she is permitted to do so, the attorney will control the management of cases and the assignment of judges.

The solution is not to remove the judge, but for counsel to change her behavior.

She must act professionally, ethically and courteously.  She must observe courtroom decorum, respect opposing counsel and the court, comply with court orders, cease making inaccurate and misleading statements, accept rulings without openly displaying disdain, follow the court's instructions and stop ignoring evidentiary rulings.

## Conclusion

No objective observer having an awareness of all the facts could conclude that I did not act impartially or fairly in the *Wallace* and *Vitalis* trials.  Nor is there any credible evidence of a deep seated and extreme bias against Rohn that can be imputed against her clients.  In short, there is no basis for recusal.  Therefore, the motions will be denied.

The cases will now be severed and separate orders issued in each.